IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| JEFFREY KENT, | § | |
| | § | No. 14, 2015 |
| Defendant Below- | § | |
| Appellant, | § | Court Below: Superior Court |
| | § | of the State of Delaware |
| v. | § | |
| | § | |
| STATE OF DELAWARE, | § | ID No. 1302002915 |
| | § | |
| Plaintiff Below- | § | |
| Appellee. | § | |

Submitted: January 20, 2016
Decided: March 11, 2016

Before **STRINE**, Chief Justice, **HOLLAND**, **VALIHURA**, **VAUGHN**, and **SEITZ**, Justices, constituting the Court *en banc*.

### ORDER

On this 11th day of March 2016, it appears to the Court that:

(1) Defendant-Below/Appellant Jeffrey Kent appeals from a Superior Court jury verdict finding him guilty of Murder in the First Degree[1] and Possession of a Firearm During the Commission of a Felony ("PFDCF").[2] Kent asserts four claims on appeal. First, Kent claims that his right to due process was violated because the State failed to provide *Brady* material until the eve of trial. Second, Kent contends that the State committed prosecutorial misconduct during closing arguments. Third, Kent claims he

---

[1] 11 *Del. C.* § 636.

[2] 11 *Del. C.* § 1447A.

received ineffective assistance of counsel because a conflict of interest existed between his trial counsel and a State witness. Last, Kent contends that the cumulative effect of the first three claims denied him his right to a fair trial. We find no merit to Kent's appeal and affirm.

(2) On June 30, 2011, Dewey Lee was stopped at the intersection of West 8th and Monroe Streets in Wilmington, Delaware. While he was stopped, a man on a bicycle approached his vehicle and began speaking with him. At some point during the conversation, the man on the bicycle shot Lee. Lee's vehicle then accelerated west on 8th Street before striking a utility pole. The man on the bicycle fled north on Monroe Street.

(3) When the Wilmington Police responded to the scene, they found Lee behind the wheel of his vehicle. He was unresponsive and bleeding from a gunshot wound to his torso. He died as a result. During the investigation, the Wilmington Police located three eyewitnesses: Thurman Boston, Brianna Brown ("Brianna"), and Dajuan'ya Brown ("Dajuan'ya"). All three identified Kent as the man on the bicycle.

(4) In February 2013, Kent was indicted on charges of Murder in the First Degree and PFDCF. Two attorneys from the Public Defender's Office ("PDO") were appointed to represent him. Shortly after being appointed, Kent's counsel sent the State a discovery request, which included a request for a list of the State's witnesses.

2

The State responded, but did not provide a list of witnesses, citing concerns for the witnesses' safety. This concern may have received some confirmation in May 2014 when Wilmington Police came into possession of a letter from Kent requesting that his nephew locate the witnesses to the crime.

(5) On July 16, 2014, defense counsel again requested a witness list. One reason defense counsel requested the names of the witnesses was to identify potential conflicts of interest. The State requested a protective order for the witness list on July 29, 2014, protecting against disclosure of the names to the defendant. In the weeks that followed, a number of witness statements were provided to Kent's attorneys.

(6) Jury selection was scheduled to begin on September 8, 2014. On September 2, 2014, the State provided the transcript of Monica Miller's statement wherein she stated that she was with Brianna and Dajuan'ya at the time of the incident and that one could not see the intersection of 8th and Monroe from their vantage point.

(7) On September 6, 2014, the State advised Kent's trial counsel that the statements of Wallace Archy, Dexter Briggs, and Raheem Smith would not be disclosed because the statements contained no *Brady* material. The next day, the State changed its position and provided Archy's and Smith's statements. In his statement, Archy stated that the shooting occurred at a different intersection, 8th and Washington. Smith told police that he did not see a white person at 8th and Monroe (the victim was

3

white), and that it was impossible to see the intersection from where Brianna and Dajuan'ya were located.

(8) On the same day that the Archy and Smith statements were disclosed, Kent filed a motion to dismiss, alleging that the Miller, Archy, and Smith statements contained *Brady* material, which was disclosed in an untimely manner and prevented defense counsel from using the evidence effectively. The following day, the trial court held a hearing on the motion. The trial court denied Kent's motion because Kent's trial counsel had been provided the witnesses' statements, and the State was making all three witnesses available to be interviewed by defense counsel. The jury was selected on September 8, 2014, and trial commenced on September 10, 2014.

(9) During pretrial proceedings, the trial court also heard arguments regarding a potential conflict of interest resulting from the PDO's representation of Boston in an unrelated matter. At the trial court's request, Kent filed a memorandum of law requesting that the PDO be allowed to withdraw as Kent's counsel, or in the alternative, prohibiting Boston from being called as a witness. On August 26, 2014, the trial court requested additional information in support of Kent's motion for an in-camera review. Kent's trial counsel declined to provide the additional information requested on the grounds that Boston did not give permission to release confidential information. On September 2, 2014, the trial court reminded Kent's trial counsel that

4

it could reveal Boston's confidential information upon court order, but counsel did not respond or comply with the trial court's request until after the trial court informed counsel of its decision to deny the request.

(10) The trial court issued an opinion denying Kent's motion to prohibit Boston from being called as a witness or for appointment of new counsel on September 3, 2014. The representation of Boston had concluded by March of 2014, approximately six months before Kent's trial. The trial court found that Kent's trial counsel failed to meet their burden of showing that a conflict did exist because the only evidence offered was an alleged conflict due to Boston's mental health history, which the trial court determined was public knowledge. Without any other evidence, the trial court held that there was no actual conflict regarding the representation of Boston on the unrelated charges.

(11) At trial, Boston testified for the State that he was behind Lee at the intersection and that Kent was the shooter. Brianna and Dajuan'ya both testified that they saw Kent from the stoop of their home at 814 West 8th Street. Miller testified for the defense that she was with Brianna and Dajuan'ya at the time of the incident, and that one could not see the intersection of West 8th and Monroe from the steps of 814 West 8th Street. Archy, also called by the defense, testified that he was on Monroe Street between 7th and 8th on the evening of the incident. He further testified that he

5

did not observe Lee's vehicle stopped at the intersection and that he saw it speed through the intersection. Although Kent's trial counsel was able to interview Smith, he was not called as a witness.

(12) During closing arguments, Kent's trial counsel implied that Boston may have received a benefit for testifying against Kent. Trial counsel also implied that Boston changed his story to comport with Brianna and Dajuna'ya. In response, the State argued that the jury could only believe trial counsel's suggestion if the jurors were to violate the rule on speculation because there was no evidence that Boston received a benefit, only that he was hoping for help with his case. The State also argued that there was no evidence presented to support a finding that Boston changed his story to appear more credible.

(13) The State also argued that Kent's trial counsel did not read the entire redacted letter that Kent had written to his nephew, a statement which was not correct. After the trial court admonished the State regarding the inaccuracy of its statement, the State informed the jury that it was mistaken and that Kent's trial counsel had, in fact, read the entire letter. Shortly after, the State argued that Archy heard a gunshot and immediately saw a vehicle travel through the intersection. After it was brought to the State's attention that this was incorrect, the State informed the jury that there was a ten to fifteen second delay between the gunshot and when Archy saw the vehicle speed

6

through the intersection. Kent was convicted of Murder in the First Degree and PFDCF.

(14) Kent filed motions for judgment of acquittal and for a new trial on September 26, 2014. On December 19, 2014, the trial court denied both motions, and Kent was sentenced to life in prison. This appeal followed.

(15) Kent first claims that the trial court erred in denying his motion to dismiss because the State failed to provide exculpatory and impeachment evidence in a timely manner, as required by *Brady v. Maryland*.[3] "[C]laims that the State failed to disclose exculpatory evidence[] are reviewed *de novo*."[4]

(16) A *Brady* violation occurs when: "(1) evidence exists that is favorable to the accused, because it is either exculpatory or impeaching; (2) that evidence is suppressed by the State; and (3) its suppression prejudices the defendant."[5] "If the evidence is both favorable and material, a determination must be made whether its 'delayed disclosure precluded . . . effective use of the information at trial.'"[6]

(17) Kent's contention that the State's delay in disclosing the statements of Archy, Miller, and Smith denied him the opportunity to use the material effectively is

[3] 373 U.S. 83, 83 (1963).

[4] *Wright v. State*, 91 A.3d 972, 982 (Del. 2014).

[5] *Starling v. State*, 882 A.2d 747, 756 (Del. 2005).

[6] *White v. State*, 816 A.2d 776, 778 (Del. 2003) (quoting *Atkinson v. State*, 778 A.2d 1058, 1062 (Del. 2001)).

7

unavailing. Kent was provided the statements of all three witnesses before trial. All three witnesses were also made available to Kent. At trial, Kent used the statements of Archy and Miller in an attempt to cast doubt on the State's theory. Thus, the trial court correctly determined that there was no *Brady* violation.

(18) Second, Kent claims that the trial court erred in denying his motion for a new trial because the State committed prosecutorial misconduct during closing arguments when it: (1) stated that the "rule against speculation" prohibited the jury from finding that Boston changed his story to appear more credible or that Boston may have received an unknown benefit for his testimony; (2) argued that Kent's trial counsel did not read Kent's letter in its entirety; and (3) misstated Archy's testimony regarding the amount of time between the gunshot and observing Lee's vehicle travel through the intersection.

(19) This Court reviews the record *de novo* to determine whether the State committed prosecutorial misconduct.[7] "Only improper comments or conduct that prejudicially affect the defendant's substantial rights warrant a reversal of his conviction."[8] To make this determination, "we apply the three factors of the *Hughes* test, which are: (1) the closeness of the case, (2) the centrality of the issue affected by

[7] *Baker v. State*, 906 A.2d 139, 148 (Del. 2006).
[8] *Id.* at 149.

the error, and (3) the steps taken to mitigate the effects of the error."[9] If the individual instances of misconduct do not warrant reversal, we may still reverse if we determine the State's errors were so repetitive that "they cast doubt on the integrity of the judicial process."[10]

(20) Kent's claim of prosecutorial misconduct has no merit. The State's response to Kent's argument that Boston changed his story to comport with that of the Brown sisters does not amount to prosecutorial misconduct. Nor does the State's response to Kent's argument that no one knows if Boston received a benefit. The State's comments did not amount to improper burden shifting. Rather, the State simply pointed out that Kent's assertions were not supported by any evidence. Although the State's inaccurate statements are arguably misconduct, both statements were corrected immediately after the inaccuracies were brought to the State's attention. Therefore, the trial court did not err in denying Kent's motion for a new trial based on prosecutorial misconduct.

(21) Third, Kent claims that the trial court erred in denying his motion to withdraw or prohibit Boston from testifying because another attorney from the PDO

---

[9] *Id.*

[10] *Id.*

9

represented Boston, which created a conflict of interest with his trial counsel. "Because a conflict of interest is a question of law, our review is *de novo*."[11]

(22) "To be entitled to relief in a conflict of interest dispute, the defendant must: (1) 'prove by clear and convincing evidence there is a conflict of interest in the first place;' and (2) 'demonstrate how the conflict will prejudice the fairness of the proceeding.'"[12]

(23) Kent's third claim has no merit. Specifically, Kent's reliance on *Mirabal v. State*[13] is misplaced. In *Mirabal*, the PDO represented two individuals who were charged with separate crimes stemming from the same incident.[14] In addition to an actual conflict, Mirabal was also able to show that he was prejudiced because his trial counsel did not call the other individual to testify out of fear that she would make self-incriminating statements.[15]

(24) Here, Kent fails to show how he was prejudiced when the PDO represented Boston in matters that are completely unrelated to this case. The only information the PDO offered to support its belief that a conflict existed was information regarding Boston's mental health, but the trial court determined that this information was public.

---

[11] *Mirabal v. State*, 2014 WL 1003590, at *2 (Del. Mar. 11, 2014).

[12] *Hitchens v. State*, 2007 WL 2229020, at *2 (Del. July 26, 2007) (quoting *IMC Global, Inc. v. Moffett*, 1998 WL 842312 (Del. Ch. Nov. 12, 1998)).

[13] 2014 WL 1003590, at *1.

[14] *Id.* at *1.

[15] *Id.* at *2.

Despite the opportunity to do so, Kent failed to provide any more information to the trial court that would support his contention. Here, the trial court did not err when it denied Kent's motion to withdraw.

(25) Because we find no merit to his first three claims, his fourth claim of cumulative error fails without further analysis.

NOW, THEREFORE, IT IS ORDERED that the judgment of the Superior Court is **AFFIRMED.**

BY THE COURT:

Justice

11